IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 10, 2017

**STATE OF TENNESSEE v. JAMES WILLIAM MABE**

**Appeal from the Circuit Court for Warren County**
**No. 15-CR-521    Larry B. Stanley, Jr., Judge**

**No.  M2016-02096-CCA-R3-CD**

The Defendant, James William Mabe, was found guilty by a Warren County Circuit Court jury of three counts of attempted rape of a child, a Class B felony, and three counts of aggravated sexual battery, a Class B felony. *See* T.C.A. §§ 39-13-522 (2014) (child rape); 39-12-101 (2014) (attempt); 39-13-504 (2014) (aggravated sexual battery).  The trial court merged the attempted child rape convictions with the aggravated sexual battery convictions and imposed eleven-year sentences for each conviction.  The court ordered partial consecutive sentences, for an effective twenty-two-year sentence at 100% service.  On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions, (2) the trial court erred by failing to require the State to make an election of the offenses, (3) the trial court erred by failing to instruct the jury on the lesser included offenses of child rape; and (4) his sentence is excessive. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Brandon J. Cox (on appeal), Smithville, Tennessee, and Daniel Barnes (at trial), Sparta, Tennessee, for the appellant, James William Mabe.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Lisa S. Zavogiannis, District Attorney General; and Tom Miner, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

        This case involves allegations of inappropriate sexual contact between the victim and the Defendant, the victim's then-stepfather.  At the trial, the victim's father, a county correction officer, testified that the victim was eight years old at the time of the March 2016 trial and that he and the victim's mother had two additional children.  He said that he and the

victim's mother married in 1989 and divorced in 2011. He said that he remarried in 2011 and that his current wife had children from a previous marriage. He said the victim's mother married the Defendant sometime after the 2011 divorce. The victim's father said that during the divorce proceedings, he and the victim's mother agreed to share custody of the victim and that the arrangement worked well for everyone. He said that, additionally, he always picked up the victim from her mother's home when the victim's mother needed and that if he were working, the victim's stepmother, picked up and dropped off the victim.

The victim's father testified that on January 8, 2015, the victim was scheduled to go to her mother's home for a few hours and that the victim's stepmother drove the victim to the agreed-upon location. He said he was scheduled to pick up the victim after he left work. He said that after the victim's stepmother dropped off the victim, the victim's stepmother called him at work. He said that she asked him to go to the investigator's office and that she was already there with an investigator when he arrived. He said that she and the investigator told him that the victim had disclosed earlier that the Defendant had "molested or raped" the victim. He said that he took the victim to the sheriff's office, the Child Advocacy Center (CAC), and Our Kids Center.

The victim's father testified that he discussed the allegations with the victim's mother and that the victim's mother did not believe the victim. He said that as a result, he was concerned the victim would continue to have contact with the Defendant, and he obtained an order of protection prohibiting the victim's mother and the Defendant from having contact with the victim. He said that the victim's mother was prohibited from having contact with the victim initially but that at the time of the trial, the victim's mother was allowed supervised visitation with the victim. He said the supervised visits were ordered at the request of the Department of Children's Services (DCS).

The victim's father testified that the victim had changed since she disclosed the allegations. He said that the victim began knocking on his bedroom door at night, crying and scared. He said that this initially occurred five or six nights weekly and lasted for a long period of time. He said the victim said she was scared of the Defendant and feared what might happen if she returned to her mother's home.

On cross-examination, the victim's father testified that although the custody arrangement was for equally shared custody, any deviation from the parenting plan involved the victim's coming to his home. He said that the victim's mother mostly did not work but that she had worked between late 2013 and the end of 2014. He said the victim disclosed the allegations on January 8, 2015, and that the victim immediately went to the CAC and to Our Kids Center the following week. He said that the victim never had difficulty sleeping before her disclosure but that she had difficulty afterward.

The victim's father testified about a previous incident in which Terry Steele and the victim were "playing," that Mr. Steele pinched the victim's buttocks, that the victim reported feeling uncomfortable due to the pinch, and that the victim's father discussed it with Mr. Steele. The victim's father said that Mr. Steele apologized. The victim's father did not know about the victim's accusing the boys from Mr. Steele's neighborhood of "pinning her down on the bed." The victim's father agreed that the victim accused a boy at her school of pinching or slapping her buttocks, that the victim's father talked to the victim's teacher, that the boy was "notorious for doing that" to several children, and that the victim's father told the victim to "slap" the boy and report it to her teacher in the future. He said the incident resolved itself.

The victim's stepmother testified that she worked as a hospice nurse and as a part-time jail nurse. She said that she and the victim had a good relationship and that they had never had a "big blow-up," although the victim's stepmother did not always agree with the victim's decisions. The victim's stepmother said that on January 8, 2015, around 4:00 or 5:00 p.m., she drove the victim to meet the victim's mother in order for the victim to spend a few hours with the victim's mother before the victim's mother went to work that evening. The victim's stepmother recalled that her son went with them and that her son was the first person to mention someone had inappropriately touched the victim. The victim's stepmother said that the victim's mother was not at the meeting location and that while they waited, the victim saw a "semi truck," which the victim thought belonged to the Defendant. The victim's stepmother assured the victim that if the Defendant were with the victim's mother, the victim did not have to go with the victim's mother because of an order of protection the victim's mother obtained against the Defendant after a domestic incident unrelated to this case. The victim's stepmother said that her son stated that the victim had told him that the Defendant had placed the Defendant's hands down the victim's pants while she was napping and "touched" the victim's "privates." The victim's stepmother said that the victim shook her head at her stepbrother as though she did not want her stepbrother to say anything about the incident. The victim's stepmother said that she asked the victim if those events occurred and that the victim shook her head indicating yes. The victim's stepmother recalled that the victim was nervous and embarrassed, that the victim's stepmother asked if it felt as though anything "went inside of her body," and that the victim said she felt a finger and burning. The victim's stepmother said she asked the victim how many times this occurred, that the victim would not answer the question directly, and that the victim said this occurred when the victim lived at Mr. Steele's home and at the home across from the "cattle barn or the cows." The victim's stepmother said that the victim's mother arrived before the victim could provide any additional information. The victim's stepmother said that she encouraged the victim not to mention to the victim's mother what they had discussed until the victim's stepmother could talk to the victim's father because the victim's mother feared what might happen. She said she felt powerless to prevent the victim from going with the victim's mother because the Defendant and the victim's father were not there.

The victim's stepmother testified that after the victim left with the victim's mother, she contacted Warren County Sheriff's Investigator Travis Thaxton. She said that at Investigator Thaxton's request, she met him at the sheriff's office, that she called the victim's father and requested he come to the investigator's office, and that she told the victim's father what the victim reported earlier that day. She said that a city police officer came to the sheriff's office and completed a police report and that afterward, the victim's father drove to pick up the victim. The victim's stepmother said that the officer scheduled an appointment at the CAC for the next day.

The victim's stepmother testified that on January 9, 2015, the victim underwent a forensic interview at the CAC and that the victim was examined physically at Our Kids Center approximately two weeks later. The victim's stepmother said that she provided the victim's medical history to the nurse practitioner who examined the victim and that about four years earlier, the victim experienced a thirty-minute seizure at home, received treatment from a neurologist, had not experienced any additional seizures, and no longer took medication. The victim's stepmother said that the victim did not have memory problems and that the seizure occurred when the victim was in preschool. Based upon the victim's disclosure, the victim's stepmother also reported to the nurse practitioner that digital penetration occurred on more than one occasion and that the victim was shown pornography.

The victim's stepmother testified that she was present during the victim's examination at Our Kids Center and that the victim repeated the same allegations the victim made on January 8, 2015. The victim's stepmother said that the victim had complained of painful urination since the victim's stepmother had known the victim and that the issue was ongoing. She said that she treated the victim's complaint with baking soda baths and ointment and that the problem resolved itself until the victim presented again with the same symptoms. The victim's stepmother said that at the time of the trial, the victim complained less frequently.

On cross-examination, the victim's stepmother testified that the victim had not taken seizure medication for approximately two years. She said that when the victim saw the semi-truck on January 8, the victim became scared. The victim's stepmother said that the incidents alleged by the victim occurred in the summer, which was months before the victim's disclosure. The victim's stepmother denied that she told the victim not to report the allegation to the victim's mother. The victim's stepmother said that she told the victim not to tell her mother that night because the victim said she had told her mother previously, but her mother did not do anything about the allegation. The victim's stepmother stated that the criminal charges related to the order of protection the victim's mother obtained against the Defendant were dropped soon after the order was obtained.

The victim testified that she was age eight and that she was home schooled, although she went to school the previous year. She said that before the incidents occurred, her mother lived at Mr. Steele's home for a while and that the Defendant came there sometimes. She said that at one point, the victim's mother lived with the Defendant "close to some cows."

The victim testified that on the day her stepmother drove her to meet her mother, she saw a truck she thought belonged to the Defendant because he was a truck driver. She said she did not expect the Defendant to be there. She said that while they waited for her mother, her stepbrother told her stepmother that the Defendant had "touched" her, that she told her stepbrother the Defendant had touched her, and that she did not remember what she told her stepmother while they were inside the car. The victim did not think she went with her mother that day and did not recall going to the sheriff's office. She recalled going to the CAC and said she went to the CAC for them to "help [her] with the problem . . . [w]hat [the Defendant] did." She remembered the interview at the CAC and said the woman showed her the cameras and the microphone inside the interview room. She said that she watched the video recording of the interview and that nothing was missing from or changed in the recording. She said, though, that after watching the recording, she told the prosecutor that she may have misunderstood the woman who asked questions.

The victim testified that during the interview, she discussed living at Mr. Steele's home. She said that when her mother and the Defendant lived at Mr. Steele's home, she, the Defendant's daughter from a previous relationship, her mother, and the Defendant lay in a bed together at night and that the Defendant "touched" her. She did not recall who she lay beside but said the Defendant touched her "[f]ront and back." The victim was shown a drawing of a girl, displaying the front and back of the body, and was asked to circle the areas the Defendant touched. The victim circled the genital and buttock areas. She said that she was unsure with what the Defendant touched her, that she felt something "inside" her "front," and that she thought it had to be the Defendant's hand. The victim said she told her mother and her stepmother about this incident. The victim said she told her mother about this incident when she and her mother were "putting up cans" in the refrigerator at Mr. Steele's home. The victim said she told her mother that the Defendant "touched" her, although not where the Defendant touched her.

The victim testified that she did not recall any additional incidents occurring at Mr. Steele's home but said that an incident occurred at a place near "where there were cows," which she remembered because she and her mother lived next to the cows. She said that at the home beside the cows, she, the Defendant's daughter, and the Defendant lay in the Defendant and the victim's mother's bed to take a nap when the victim's mother was at work. The victim recalled wearing underwear and a shirt. She said that she awoke from her nap when the Defendant "touched" her and that the Defendant's hand was inside the "front" of her "pants." She said she felt the Defendant's hand inside her. When asked if the

-5-

Defendant touched her buttocks during this second incident, she said, "I think both of the times it was the front." She thought the Defendant touched her buttocks but was unsure.

The victim testified that another incident occurred in the living room at the home beside the cows. She said that she and the Defendant were sitting in a rocking and reclining chair with a purple blanket over them, that they were watching Scooby-Doo, and that she thought the Defendant's brothers were there. She said that the Defendant "touched" her when they were covered by the blanket. She said that the Defendant's hand went "in her pants" and on her "front" private area. She denied the Defendant touched her buttocks and said she did not think anything went inside of her. The victim did not recall any incidents involving Mr. Steele or a boy at her school.

On cross-examination, the victim testified that she suffered from nightmares that began a long time ago. She recalled having a seizure but denied she had difficulty sleeping because of it. She said that when her mother lived at Mr. Steele's home, the victim, her mother, the Defendant, and the Defendant's daughter slept in a large bed and that Mr. Steele slept in another bedroom. The victim said that sometimes she slept in a Hello Kitty bed. She recalled the Defendant's being sick and sleeping with a machine that covered a portion of his face. Relative to the incident the victim described at Mr. Steele's home, she thought the Defendant was awake when he touched her.

The victim testified that when her mother lived at the home near the cows, she and the Defendant's daughter slept in the same bed at night but that she slept in her mother's bed at naptime. She said that when her mother lived near the cows, the Defendant and "Mr. Earl" cared for her when her mother was at work. Relative to the incident in which she watched Scooby-Doo, she thought "a few" of the Defendant's brothers were there but was unsure of the number. She said that she was familiar with the Defendant's truck because he took her to work with him once when her mother lived at Mr. Steele's home.

On redirect examination, the victim testified that the Defendant showed her a cell phone on the same day of the incident that occurred in bed at the home near the cows. She said that the Defendant showed her a video recording of a man with "his hand under a [naked] girl's bottom and she got up and walked away." She said that the Defendant asked her to tell him what occurred in the recording. On recross-examination, she stated that she thought the cell phone belonged to her mother and was blue. She agreed that every time the Defendant touched her, she was asleep or about to go to sleep.

M'Lee Hudgins, a forensic interviewer with the CAC, testified that she conducted the victim's interviews on January 9, 2015, and February 5, 2015. Video recordings of the interviews were played for the jury.

In the January 9 recording, the victim stated that her stepmother brought her to the CAC to talk about the Defendant's touching her "privates." The victim said the Defendant touched her on two occasions, once at her mother's home and once at Mr. Steele's home. She explained that she "felt a finger . . . inside" her "front one." The victim was shown a drawing and circled the vaginal area when asked to identify her front one. She said that the Defendant "rubbed" her "back one," which she identified as her buttocks, that he touched her under her clothes with his hands, that she did not feel anything enter her buttocks, and that this occurred when her mother was at work. She said that a couple days later, she told her brother about the incident, that he mentioned it to the victim's stepmother in the car, and that the victim told her stepmother about the incident. The victim said the incident occurred when she lay in bed with the Defendant and the Defendant's daughter at naptime.

The victim explained that one incident occurred when she, the Defendant, and the Defendant's daughter were in the Defendant and the victim mother's bed. The victim said that she had taken naps with the Defendant previously but that the Defendant had not touched her. The victim said that the Defendant began touching her when they were taking a nap and that "he did the front first." The victim said that it felt as though the Defendant's finger was inside her, that it was "going around and around," and that it felt strange. She said that after the touching, the Defendant showed her a "gross video" on his cell phone, that the video showed a naked girl sitting on a sofa with a man touching her "back private part," and that the Defendant asked, "Do you think she did not feel good?" The victim said that she responded, "Whatever," that she had to say something to the Defendant, and that the Defendant "would have got on to her" if she did not respond. She said the Defendant's daughter was asleep in the bed when the Defendant showed her the video. The victim thought the Defendant showed her a second video but could not recall its contents. She said that the Defendant did not say anything when he touched her. She said that she removed her pants during naptime but wore underwear and a long-sleeve shirt and that the Defendant removed his black short-sleeve shirt with blue letters but wore shorts or underwear. She denied touching the Defendant's body.

The victim stated that another incident occurred when the victim's mother and the Defendant lived at Mr. Steele's home, which she said was before the incident at the home near the cows. She said that the Defendant touched her front part when she lay in bed with her mother and the Defendant. The victim said the Defendant's daughter was either sleeping with them or with Mr. Steele. She said that her stomach hurt, that her mother said she would rub the victim's stomach, that the Defendant began rubbing the victim's stomach instead, and that the victim did not trust the Defendant. The victim said that the Defendant touched the "front" inside her clothes and that the Defendant "went way down." She said that she "did not hardly remember" whether she felt the Defendant's finger but said later that "there was a finger . . . that went inside and did something." She said it felt as though the finger

went "around and around." She said that she thought she was age six at the time of this incident and that she was age seven at the time of the interview.

The victim stated that the Defendant's touching her did not feel right but that the Defendant did not say anything about the incidents. She said she told her mother about the Defendant's touching her privates but that her mother acted as though she did not care.

The victim stated that the first incident was at Mr. Steele's home, that "squirrels jumped over" his home, and that they lived at Mr. Steele's home during the summer. She said that the second incident occurred at another home when it was summer.

During the February 5 forensic interview, the victim stated that "something else came up" but that she could not remember. She said that other than the two incidents she discussed in the previous interview, she almost fell asleep in a living room chair while watching Scooby-Doo, that the Defendant touched her "front private," that she could not remember if he touched her under her clothes, that she could not remember if anything entered her body, and that she did not think the Defendant said anything during the incident. She described the chair as a rocking chair and said that she and the Defendant were reclined in it. She said that she and the Defendant lay on their backs and that the Defendant did not want her to touch his body. She thought her mother was at work but was unsure. She said that the Defendant wore a black shirt with "blue stuff" on it and that she wore a Barbie shirt and pants. She said she and the Defendant were under a purple blanket during the incident.

On cross-examination, Ms. Hudgins testified that she was unaware of any additional allegations of abuse by the victim. Ms. Hudgins had no knowledge about a boy at school pinching the victim's buttocks and said the victim mentioned during the interview that Mr. Steele tickled her. Ms. Hudgins said that determining whether a child had been coached was a task for experts but that her training included asking enough questions in order for "team members" to determine whether a child had been coached. On redirect examination, Ms. Hudgins stated that disclosures of sexual abuse occurred in stages. She said that when a child had suffered abuse more than once, it sometimes became difficult for the child to process the incidents and that the child might disclose various incidents at different times. On recross-examination, she agreed that another explanation for varying stories was that a child fabricated the allegations.

The victim's mother testified that the victim was born on September 19, 2007, and that she and the victim's father shared custody of their children when they divorced. She said that she and the Defendant married in February 2011 and that they divorced in July 2015. Relative to the incident the victim described at Mr. Steele's home, the victim's mother said that Mr. Steele was the victim's great uncle and that she and the Defendant lived with Mr. Steele twice during their marriage. The victim's mother recalled living at Mr. Steele's

home in June 2011 and between November 2013 and June 2014. She said that between November 2013 and June 2014, she, the Defendant, the victim, and the Defendant's daughter lived at Mr. Steele's home. The victim's mother said that during this time, she worked nights from 11:00 p.m. to 7:00 a.m. and that the Defendant and Mr. Steele cared for the victim when the victim's mother worked.

The victim's mother testified that the Defendant suffered from renal failure, that the children slept at night when she worked, that the Defendant was capable of caring for the victim when he was not hospitalized, and that "there on the end," the Defendant required assistance bathing. The victim's mother recalled coming home from work and getting the victim ready for school and said that Mr. Steele drove the victim to school and that she picked up the victim from school. The victim's mother said that during the summer months, the Defendant cared for the victim and the Defendant's daughter and that sometimes the children lay in bed with her to nap.

The victim's mother testified that when the victim mentioned the home near the cows, the victim was talking about the home near the stock barn, where they lived between June 2014 and November 2014. The victim's mother said that she, the Defendant, the victim, and the Defendant's daughter lived at the home, that the victim's mother lost her job due to illness, and that she began working the day shift on the weekends for a new employer. She said that when she worked, the Defendant cared for the victim, that she later began working the night shift, and that their neighbors, Jean and Earl Collins, assisted with childcare, although the Defendant was the primary care provider when the victim's mother worked. The victim's mother said that the Defendant had a cell phone when they lived at the home near the cows, that he did not allow her to use his cell phone, and that she did not know the phone's contents.

The victim's mother testified that she learned of the victim's allegations on January 9, 2015, when a deputy delivered an order of protection preventing her from having contact with the victim. The victim's mother said that the allegations were shocking but that she believed the victim after she and the victim spoke in July 2015. The victim's mother said that during the six months between the victim's allegations and her speaking to the victim, the victim's mother questioned the veracity of the allegations because the Defendant always "petted" the victim and treated the victim more favorably than the Defendant's daughter. The victim's mother said that she expressed her reservations to the DCS investigator and to law enforcement and that as a result, DCS obtained an order of protection.

The victim's mother testified that the victim told her that the incidents occurred when the victim's mother was at work on the weekends. The victim's mother said that the victim reported an incident in which the victim was in a rocking chair watching Scooby-Doo when they lived at the home near the cows. The victim's mother said that at the time, they had a

rocking recliner in the living room, that the victim watched Scooby-Doo movies on a laptop computer, and that they had a purple throw blanket.

The victim's mother testified that after speaking with the victim in July 2015, the victim's mother confronted the Defendant about the allegations by calling him a child molester because the victim had alleged that he touched the victim's private area and digitally penetrated the victim. She said that the Defendant responded, "God had a big eraser and he would forgive you for anything." She said that afterward, she had little contact with the Defendant. She said that she wanted her visitation rights reinstated and that the decision to reinstate lay with DCS, not the victim's father.

On cross-examination, the victim's mother testified that she worked nights mostly when she lived at Mr. Steele's home between November 2013 and June 2014, and that the Defendant worked for a construction company. She said that the Defendant left for work at 4:00 or 4:30 a.m. and returned home between 6:00 and 7:00 p.m. but that the Defendant became ill and was admitted into the hospital for treatment periodically. She said that the Defendant worked for a few months after moving into Mr. Steele's home before becoming ill. She recalled the Defendant began sleeping with a "sleep apnea machine" when he became ill and said he slept on his side and with pillows in front of his stomach. She said that when the Defendant became extremely ill, she assisted him with dressing and bathing. She said that before the Defendant became too ill to work, he injured himself at work and later fell asleep while driving because of accumulated fluid. She agreed the Defendant fell asleep often as result of his illness and sleep apnea. She said that the Defendant had difficulty moving around and breathing at times when the fluid accumulation was high.

The victim's mother testified that when she and the Defendant lived at Mr. Steele's home, she had custody of the victim 40% of the time. The victim's mother said that the Defendant's older daughter visited the home when the daughter wanted and that the victim's brother visited periodically but did not stay overnight.

The victim's mother testified that when they lived at the home near the cows, the victim was in her custody about 50% of the time. She said that the Defendant was in and out of the hospital and not working at this time. She said that she usually did not take the victim to Mr. and Mrs. Collins's home because the victim was asleep when she left for work. The victim's mother said that the victim stayed with Mr. and Mrs. Collins infrequently because the victim usually wanted to go to the victim's father's home when the victim's mother was at work.

The victim's mother testified that the Defendant kept his cell phone with him when the Defendant was hospitalized and that the phone was black with a red case. She said her phone was white. She agreed the victim had accused others of touching her, including Mr.

Steele, and that the victim's mother saw Mr. Steele pinch the victim's buttocks. The victim's mother said that she, the victim's father, and Mr. Steele discussed the incident immediately. The victim's mother agreed that the victim accused Mr. Steele's neighbors of pinning the victim on a bed and that the allegation was false. The victim's mother agreed that the victim accused a boy at school of slapping the victim's buttocks and said that she spoke to the victim's teacher about the incident. The victim's mother said that the victim had suffered nightmares and that the victim might have had a nightmare once every three months when the victim was at her home. The victim's mother said that the victim did not wake up screaming when the victim had a nightmare but told her about it the next morning.

The victim's mother testified that the Defendant took the victim to work once and that the victim rode in the dump truck, not a semi-truck. The victim's mother said that the victim liked the Defendant and that the victim never showed fear or apprehension when she was around the Defendant. The victim's mother said the last time the Defendant and the victim were alone occurred when the Defendant picked up the victim at the county fair in September 2014. She said this occurred when they lived at the home near the cows.

Lisa Milam, a forensic social worker at Our Kids Center, testified that the victim was evaluated on January 21, 2015. Ms. Milam said that a medical history was obtained and that the victim reported a burning sensation when she urinated. Ms. Milan said that she asked the victim if anyone had touched her "pee pee" and that the victim initially responded no. Ms. Milam said, though, that the victim clarified that her stepmother touched her pee pee in order to put medication on it to make it feel better and that the Defendant had "touched the front and back but not [her] pee pee." The victim identified the front as the area from which she urinated but not her pee pee and said she referred to the area as "monk-monk." Ms. Milam said that the victim reported that the Defendant touched her with his hand and finger. The victim reported that the touching occurred when she lay in bed between the Defendant and his daughter, that the victim wore a shirt, that the touching occurred under the victim's clothes and felt as though the Defendant touched her inside and outside her monk-monk. Ms. Milan said that the victim reported that the Defendant touched her buttocks but not inside. The victim denied that the Defendant touched her with any other part of his body and that any other person had touched her.

Ms. Milam testified that Lori Litrell performed the physical examination and obtained a medical history from the victim's stepmother, who reported a history of a seizure but no history of genital abuse. Ms. Milan said that the victim's stepmother also reported the victim had a history of burning with urination, constipation, and itching and redness in the genital area, which was treated with ointment. Ms. Milan stated that Ms. Litrell's report showed that the victim had a normal examination without acute or chronic signs of trauma. Ms. Milan stated that the finding did not exclude the possibility of sexual abuse and that negative

findings were expected in the majority of abuse cases. She said that only about seven percent of children had abnormal physical examinations after an incident of sexual abuse.

The Defendant testified that he did not digitally penetrate the victim or rub her genitals. He said that he suffered from stage five renal failure and that dialysis kept him alive. He said that he fell from a silo at work, that he lay on the ground for hours before anyone found him, and that high blood pressure during this time resulted in kidney damage. He said that as a result of his condition, he suffered from swelling, could not consume more than one liter of fluid per day, had decreased sexual desires, and experienced insomnia. He said he had undergone dialysis four to five times per week since May 2015.

The Defendant testified that when he and the victim's mother lived at Mr. Steele's home, he was in stage four kidney failure, that he slept excessively, and that he retained more fluid than he had before reaching stage four. He said that at this time, he was unable to bathe himself, the skin on his legs and feet would "bust" from the swelling, and he was unable to dress himself. He said that he stopped working in April 2013, about one month before they moved out of Mr. Steele's home. He said that just before he stopped working, he fell asleep while driving his truck and struck another vehicle, which resulted in his sustaining additional kidney injuries. He recalled sleeping with a pillow on his chest to prevent any injuries if the victim's mother kicked him while asleep. He said that he also began sleeping with a sleep apnea machine and that he slept facing the machine because of the cords. He said that he suffered cramps in his arms, fingers, legs, and feet, that the cramps kept him awake at night, and that the cramps caused soreness, making it difficult to walk. The Defendant stated that immediately after he stopped working and when he lived at Mr. Steele's home, he spent more than one month in the hospital to remove excess fluid. He said that after he and the victim's mother moved into the home near the cows, he spent fifteen days in the hospital.

The Defendant testified that just before he and the victim's mother moved out of Mr. Steele's home, the Defendant slept in "the big bed in the back" with the victim's mother and that the victim and the Defendant's younger daughter slept in Mr. Steele's bedroom with Mr. Steele, although Mr. Steele stayed awake late watching television in the living room. The Defendant said that after they moved to the home near the cows, the victim did not stay at the home frequently. He said that his condition worsened after they moved and that he went to the hospital monthly.

The Defendant testified that the victim's allegations against the boy at her school and the boys in Mr. Steele's neighborhood occurred when the Defendant and the victim's mother lived at Mr. Steele's home. He said that the victim's allegations against Mr. Steele's neighbors appeared false because the victim and the boys mostly played outside and only in the living room inside the home. The Defendant said that based upon the victim's mother's discussion with the victim's teacher, the alleged incident with the boy at school did not

occur. The Defendant said that before his illness prevented him from working, the victim's mother was home with the children but that after he was unable to work, she began working. He recalled that the victim's mother helped him into bed before she left for work at night and that the victim and his daughter slept with Mr. Steele because Mr. Steele was able to help the children if they needed something during the night. The Defendant said that the victim would "not hardly sleep" in his bedroom "because of the squirrels," which the victim thought were "monsters running across the house." He said that the victim had difficulty sleeping the entire duration of his relationship with the victim's mother. He recalled the victim's sleeping about three hours per night and waking early.

The Defendant testified that he and the victim's mother separated one month before the trial and that the victim's mother's position about their relationship changed after speaking with DCS employees at the courthouse on the day of the DCS hearing. He said he thought the victim's mother had been threatened with permanently losing her visitation rights if she did not say she believed the victim. Relative to the incident at the home near the cows in which the victim described watching Scooby-Doo and sitting in a living room chair, the Defendant stated that they did not have a television. He said that the victim's mother had a laptop computer, that the computer did not belong to him, and that the victim's mother sometimes allowed the victim to watch videos on the computer.

On cross-examination, the Defendant testified that he worked most of the time he and the victim's mother lived at Mr. Steele's home and that he helped paint Mr. Steele's home when they moved into the home. He denied, though, that his "ability to do things was . . . sound" and said that his brothers painted the home with his limited assistance. He said that he began receiving disability benefits around January 2015 and that his kidney disease prevented him from working. He said, though, a friend who owned a construction company offered to allow him to work when he felt well enough. He denied attempting to arrange employment in an effort to have the GPS monitoring as required as a condition of his pretrial release removed.

The Defendant testified that he witnessed Mr. Steele's pinching the victim's buttocks. Relative to the victim's accusation against Mr. Steele's neighbors, the Defendant said the allegation was never "proven to be true." He said the victim's mother talked to the boys' grandmother, who said the victim's allegations were not true. The Defendant did not believe the victim's allegations. Relative to the incident with the boy at the victim's school, the Defendant said that he did not speak to the teacher, that nobody knew if the victim told the truth, and that the school would have done something if the boy had a history of inappropriate conduct.

The Defendant testified that the victim's mother obtained a divorce because DCS forced her to file for divorce. He said that he did not realize DCS had forced the divorce

until the last DCS hearing. He said the victim's mother continued living with him without interruption until one or two months before the trial. He clarified that after the victim's mother obtained the divorce, the victim's mother obtained a separate home but that the victim's mother continued to stay at his home.

The Defendant disputed taking naps when he and the victim's mother lived at Mr. Steele's home. He said that although he had taken naps, the victim's mother usually slept with the children on the bed during the day. He said that he worked during the day through the week and on Saturdays from the time they moved into Mr. Steele's home until about one month before they moved to the home near the cows. He said he also worked occasionally on Sundays during this time. The Defendant stated that when he and the victim's mother lived at the home near the cows from June to November 2014, the victim and his daughter were at Mr. and Mrs. Collins's home. He said the children never stayed alone with him.

On redirect examination, the Defendant testified that although it was impossible to recall the victim's mother's work schedule when they lived at Mr. Steele's home, she worked five jobs. Relative to Mr. Steele's neighbors, the Defendant said that the victim alleged the boys attempted to kiss her when she was at Mr. Steele's home but that "we" were there and that the home was small. He said he did not know what occurred at the boys' grandparents' home. The Defendant agreed the victim's mother spoke to the grandparents immediately. He said that the police never examined his cell phone and that to his knowledge, the police never examined the victim's mother's cell phone.

Earl Collins testified that he lived next door to the Defendant and the victim's mother when they lived at the home near the cows and that the victim and the Defendant's daughter often stayed at Mr. Collins's home. He recalled that he and his wife first began babysitting the children in June 2014. He said that the children came to his home three or four times per week, that they arrived early in the morning and stayed all day, and that he cared for the children because the Defendant was unable to care for the children due to the Defendant's health and because the victim's mother worked. Mr. Collins recalled that the victim's mother dropped off and picked up the children. He said that the children were never out of sight when they were at his home. He said the children stayed at his home until the victim's mother picked them up and that they never went home during the day. He said he never saw the Defendant alone with the victim. Mr. Collins said that he and his wife cared for the children the entire time the Defendant and the victim's mother lived at the home near the cows. Mr. Collins denied the victim mentioned the Defendant's touching her or being afraid of the Defendant. Mr. Collins denied witnessing any inappropriate behavior or contact between the Defendant and the victim.

Courtney Mabe, the Defendant's adult daughter, testified that she and the Defendant had a good relationship. She said that when she came to visit the Defendant at Mr. Steele's

home, she slept on the sofa. Ms. Mabe recalled that her younger sister and the victim slept together and that the victim sometimes slept with Mr. Steele. She said, though, that the Defendant and the victim's mother slept in their bed and that Mr. Steele slept with the victim and Ms. Mabe's younger sister. Ms. Mabe said that if the Defendant and the victim's mother were gone, the victim and Ms. Mabe's younger sister slept in the Defendant and the victim's mother's bed.

Ms. Mabe testified that after the Defendant and the victim's mother moved to the home near the cows, she visited the Defendant every weekend. She said that she never saw the victim alone with the Defendant and that she and the victim spent a lot of time together when they were both at the home. Ms. Mabe babysat the victim when needed and said the victim never acted "skittish" or scared around the Defendant and did not report any inappropriate contact with anyone.

On cross-examination, Ms. Mabe testified that she was unsure whether the Defendant and the victim's mother worked between November 2013 and June 2014. Ms. Mabe said that the victim's mother was always home with the children when the Defendant was home and that when the Defendant and the victim's mother were gone, Ms. Mabe cared for the children or the children went to Mr. Collins's home. Ms. Mabe said that at the home near the cows, she slept in the same room with the victim and Ms. Mabe's younger sister. She said that the Defendant did not work when they lived at the home near the cows. She said that Mr. and Mrs. Collins did not care for the victim and Ms. Mabe's younger sister when Ms. Mabe was at the home. She said that sometimes the victim went to Mr. and Mrs. Collins's home because the victim liked talking to them, even though Ms. Mabe, the victim's mother, and the Defendant were home.

Richard Mabe, the Defendant's brother, testified that he and the Defendant had a good relationship. Mr. Mabe said that when the Defendant and the victim's mother lived at Mr. Steele's home, Mr. Mabe visited the home often. Mr. Mabe said he visited the home near the cows a couple of times. He said that he never saw the victim at the home near the cows but that at Mr. Steele's home, the victim and the Defendant's younger daughter played. Mr. Mabe said he never saw the victim show any fear of the Defendant.

Upon this evidence, the Defendant was convicted of three counts of attempted rape of a child and three counts of aggravated sexual battery. The trial court merged the attempted child rape convictions with the aggravated sexual battery convictions and sentenced the Defendant to an effective twenty-two years' confinement at 100% service. This appeal followed.

## I & II. Sufficiency of the Evidence & Election of the Offenses

The Defendant contends that the evidence is insufficient to support his convictions. He argues that the victim's trial testimony was inconsistent with her forensic interviews and other previous statements about the incidents and with her physical examination. In a related issue, he argues that the State failed to make a proper election of the offenses for any of the charged offenses. The State responds that the evidence is sufficient to support the convictions and that the trial court's instructions to the jury were sufficient to allow the jury to render unanimous verdicts.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value . . . given to the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)*; see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn 2009)).

Rape of a child is defined as the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522. Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" *Id*. § 39-13-501(7) (2014). A defendant commits criminal attempt when he acts "with the kind of culpability otherwise required for the offense . . . [and] [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" *Id*. § 39-12-101(a)(2).

Aggravated sexual battery is defined, in relevant part, as "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [when] [t]he victim is less than thirteen (13) years of age." *Id*. § 39-13-504(a)(4). Sexual contact, in relevant part, is "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional

touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" *Id*. § 39-13-501(6) (2010) (amended 2013). Intimate parts are "the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" *Id*. at (2).

When evidence is presented of multiple offenses that would fit the allegations of the charge, the State must elect the particular offense for which a conviction is sought, and the trial court must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. *See, e.g., State v. Brown*, 762 S.W.2d 135, 137 (Tenn. 1988); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997). "The purpose of election is to ensure that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask a conviction, then the court cannot be assured of a unanimous decision." *State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993).

> This election requirement . . . ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense.

*State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000). The critical reason, however, for the election is to protect a defendant against "patchwork verdicts." *Shelton*, 851 S.W.2d at 137.

> [T]he election requirement has been applied almost exclusively in the sex crimes context, and specifically, when the defendant is alleged to have committed a series of sexual acts over a lengthy period of time against young children who are unable to identify the exact date on which any one act was perpetrated.

*State v. Johnson*, 53 S.W.3d 628, 631 (Tenn. 2001) (citing *State v. Brown*, 992 S.W.2d 389 (Tenn. 1999)). "[T]he State may introduce evidence of sex crimes allegedly committed against the victim during the time frame charged in the indictment, but, at the close of the proof, the State must elect the facts upon which it is relying for conviction." *Id.* (citation omitted). "If a jury is allowed to convict without specific evidence supporting the election, then the election is superficial and meaningless." *State v. Johnny Lee Hines*, No. 01C01-9709-CC-00405, 1999 WL 33107, at *4 (Tenn. Crim. App. Jan. 27, 1999). "The offense must be proven in accordance with the election, i.e., to have occurred on [the elected] date and under [the] circumstances." *State v. Marvin D. Nance*, No. E2005-01623-CCA-R3-CD, 2007 WL 551317, at *6 (Tenn. Crim. App. Feb. 23, 2007) (citing *Johnny Lee Hines*, 1999 WL 33107, at *6), *perm. app. denied* (Tenn. May 14, 2007). Relative to an election of the

offenses,

> [T]he standard for sufficiency of the evidence applies to the designation of offenses as though it were an element of the offenses. Not only must the state's election identify and distinguish offenses sufficiently to allow the trier of fact to render discrete and unanimous verdicts on each, the state must . . . support this election with evidence sufficient for a reasonable trier of fact to find that the offenses occurred as elected beyond a reasonable doubt.

*Johnny Lee Hines*, 1999 WL 33107, at *4.

Relative to an election of the offenses, the record reflects that Count 1 of the indictment read as follows:

> THE GRAND JURORS of Warren County, Tennessee, duly impaneled and sworn, upon their oath, present that: James William Mabe Between the dates of March 1, 2013 and August 15, 2014, in Warren County, Tennessee and before the finding of this indictment, did engage in unlawful sexual penetration of [the victim] . . . a minor child over three (3) years of age but less than thirteen (13) years of age, constituting the offense of Rape of a Child, in violation of Tennessee Code Annotated § 39-13-522, a class "A" Felony, and against the peace and dignity of the State of Tennessee.

The indictment shows that Counts 3 and 5 are identical to Count 1 in all respects except the alleged date range. Counts 3 and 5 each allege the Defendant committed rape of child between August 15, 2013, and January 8, 2015.

> The record reflects that Count 2 of the indictment read as follows:

> THE GRAND JURORS of Warren County, Tennessee, duly impaneled and sworn, upon their oath, present that: James William Mabe Between the dates of March 1, 2013 and August 15, 2014, in Warren County, Tennessee and before the finding of this indictment, did engage in unlawful sexual contact with [the victim] . . . a child less than thirteen (13) years of age, constituting the offense of Aggravated Sexual Battery, in violation of Tennessee Code Annotated § 39-13-504, a class "B" Felony, and against the peace and dignity of the State of Tennessee.

The indictment shows that Counts 4 and 6 are identical to Count 2 in all respects except the alleged date range. Counts 4 and 6 each allege the Defendant committed aggravated sexual battery between August 15, 2013, and January 8, 2015.

-18-

The record does not reflect that the trial court, trial counsel, and the prosecutor discussed an election of the offenses or the final jury instructions. The trial court, however, provided the jury with the following instructions before closing arguments:

Count 1, rape of a child, alleged incident happened at the residence of Terry Steele. You begin by determining whether the defendant is guilty or not guilty of that charge. If you find guilty, you go to Count 2. If you find not guilty you go down to the first lesser included offense of attempted rape of a child. If you find guilty, you go to Count 2 . . . .

Next page we begin with Count 2, aggravated sexual battery. That again . . . the alleged incident happened at the residence of Terry Steele. You start with the charged offense of aggravated sexual battery. If guilty, go to the next count. If not guilty, go to the next lesser included down and so on and so forth.

. . . [T]hen you would get to Count 3, rape of a child, alleged incident happened at a residence located [at the home near the cows] when the defendant and the victim were in a bed together. You proceed in Count 3 just like you did in Count 1 using the facts that apply to that particular count.

Count 4, aggravated sexual battery, again alleged incident happened at the residence [located near the cows] when the defendant and the victim were in bed together.

Count[s] 5 and 6 again rape of a child and aggravated sexual battery. The allegation there is the alleged incident happened at a residence located [near the cows] when the defendant and the victim were in a chair together. So those are the different particular incidences.

The record does not reflect the trial court required the State to make an election of the offenses. However, an election is only required "when evidence suggests that a defendant has committed many sexual crimes against a victim." *Shelton*, 851 S.W.2d at 137. "[T]he failure to elect or give an [election of the offense] instruction should not constitute reversible constitutional trial error if it can be concluded beyond a reasonable doubt that the verdict was unanimous[.]" *State v. Frank Frierson*, No. 01C01-9112-CC-00357, 1993 WL 273974, at *25 (Tenn. Crim. App. July 22, 1993), *perm. app. denied* (Tenn. Oct. 2, 1995). The victim testified about three incidents of sexual contact. One incident at Mr. Steele's home, which the trial court explained during its final jury instructions related to Counts 1 and 2. The victim also testified about two incidents at the home near the cows. The first incident

-19-

occurred when the Defendant and the victim were lying in bed, which the trial court explained were related to Counts 3 and 4. The second incident occurred when the Defendant and the victim were sitting in a chair, which the trial court explained related to Counts 5 and 6. The victim did not testify about any additional incidents of sexual contact. We note that the jury verdict forms state that Counts 1 and 2 relate to the "[a]lleged incident . . . at the residence of Terry Steele," that Counts 3 and 4 relate to the "[a]lleged incident . . . at a residence [near the cows] when the Defendant and the victim were in bed together," and that Counts 5 and 6 relate to the "alleged incident . . . at a residence [near the cows] when the Defendant and the victim were in a chair together." We conclude that the court's instructions to the jury and the verdict forms prevented any patchwork verdict and ensured jury unanimity on each count of the indictment. The jury was provided the factual basis for each count "to differentiate among the various counts of the same offense[s]" and presented the "means . . . to make a specific conduct to a specific count." *Tidwell v. State*, 922 S.W.2d 947, 501 (Tenn. 1991).

In reaching this conclusion, we have not overlooked the Defendant's argument that the State should have elected which offense, rape of a child or aggravated sexual battery relative to each of the three incidents, the State wished to submit to the jury. In essence, the Defendant argues that the jury should have been instructed that it "could convict of either rape of a child or aggravated sexual battery, but not both" relative to each incident. The Defendant's argument is misplaced. The purpose of an election of the offenses is to prevent the State from presenting evidence of multiple incidents that would satisfy the allegation contained in a single indictment count. An election of the offenses is related to the trial evidence regarding a particularized incident. In many instances, evidence of multiple incidents is presented that would satisfy the contents of a single indictment count. The State's election in such instances is to inform the jury of which single incident the State seeks a conviction. Nothing in our jurisprudence prohibits the State from seeking a conviction based upon alternative theories of how an offense occurred. We note that during the prosecutor's closing argument, he addressed each incident separately. The prosecutor addressed Counts 1 and 2 simultaneously and stated that those counts related to the incident occurring at Mr. Steele's home. The prosecutor told the jury that Counts 3 and 4 related to the incident occurring at the home near the cows when the victim and the Defendant lay in bed together and that the remaining counts related to the incident occurring at the home near the cows when the victim and the Defendant sat on a chair.

Relative to sufficiency of the evidence, the record reflects three incidents of sexual contact. Relative to the incident at Mr. Steele's home, which pertains to indictment Counts 1 and 2, the victim testified that she, the Defendant's younger daughter, the victim's mother, and the Defendant lay in bed together and that the Defendant touched her "[f]ront and back." She identified the genital and buttock regions on a diagram during the trial indicating where the Defendant touched her. She said that although she was unsure, she thought the

Defendant touched her with his hand and that she felt something "inside" her front. During the victim's forensic interview, she provided similar information about this incident. She stated that the incident occurred when she lay in bed with her mother and the Defendant, that the Defendant touched her "front" inside her clothes, that the Defendant "went way down," and that "there was a finger . . . that went inside and did something." The victim was age seven at the time of the interview and thought she was age six at the time of the incident. The evidence is sufficient to sustain the Defendant's convictions in Counts 1 and 2.

Relative to the incident at the home near the cows occurring when the Defendant and the victim lay in bed, which pertains to indictment Counts 3 and 4, the victim testified that she, the Defendant's younger daughter, and the Defendant lay in the Defendant and the victim's mother's bed to take a nap while her mother was at work. The victim said that she wore underwear and a shirt, that the Defendant lay beside her on the bed, and that she awoke when the Defendant touched her with his hand inside the "front" of her "pants." She said that she felt the Defendant's hand "inside" her and that she thought the Defendant touched her buttocks once. During the victim's forensic interview, she provided similar information about this incident. She stated that when she, the Defendant's younger daughter, and the Defendant napped in the Defendant and the victim's mother's bed, the Defendant touched her "front first" and that she felt the Defendant's finger inside her. We conclude that the evidence is sufficient to support the convictions in Counts 3 and 4.

Relative to the incident at the home near the cows occurring when the Defendant and the victim sat on a chair, the victim testified that she and the Defendant sat on a living room rocking chair with a purple blanket over them, that they watched Scooby-Doo, and that the Defendant "touched" her when they were covered by the blanket. She said that the Defendant's hand went "in her pants" and on her "front" private area but denied that the Defendant touched her buttocks and placed anything inside her private area. During the victim's forensic interview, she provided similar information about this incident. She stated that this incident occurred when she almost fell asleep watching Scooby-Doo while she and the Defendant sat on a living room rocking chair. She stated that the Defendant touched her "front private" area and that she could not remember if the Defendant touched her under her clothes or if anything entered her body. She stated that she and the Defendant were under a purple blanket during the incident. We conclude that the evidence is sufficient to support the convictions in Counts 5 and 6.

In determining the evidence is sufficient to support the Defendant's convictions, we have not overlooked his argument that the evidence is insufficient to support his convictions because the victim provided the only evidence of the defendant's conduct and because the victim provided inconsistent statements. The victim's testimony alone is sufficient to support the Defendant's convictions and requires no corroboration. *See State v. Smith*, 42 S.W.3d 101, 106 (Tenn. Crim. App. 2001); *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). Furthermore, any inconsistencies in the victim's testimony and her

previous statements were resolved by the jury in favor of the State. This court will not reweigh the evidence or assess witness credibility. *See Bland*, 958 S.W.2d at 659; *Sheffield*, 676 S.W.2d at 547.

Likewise, the Defendant argues that no proof shows he touched the victim for the purpose of sexual gratification relative to the aggravated sexual battery convictions. However, our courts have determined that the "sexual contact" in the context of sexual battery does not require "the sexual contact itself be for sexual arousal or gratification." *State v. Mahlon Johnson*, No. W2011-01786-CCA-R3-CD, 2013 WL 501779, at *12 (Tenn. Crim. App. Feb. 7, 2013), *perm. app. denied* (Tenn. Aug. 14, 2013). Rather, "[t]he statute merely requires touching that can be 'reasonably construed as being for the purpose of sexual arousal or gratification.'" *Id*. (quoting T.C.A. § 39-13-501(6) (2010)). The evidence showed that the three incidents involved touching the victim's genital area and buttocks and that the incidents occurred when the Defendant and the victim lay in bed or sat on a chair covered by a blanket. The jury could have reasonably construed that the Defendant's touching was for the purpose of sexual arousal or gratification. Although the Defendant testified that he did not touch the victim and that his renal failure and related illnesses decreased his sexual desires, the jury was free to discredit his testimony. The Defendant is not entitled to relief.

### III.    Jury Instructions Regarding Lesser Included Offenses

The Defendant contends that the trial court erred by failing to instruct the jury that aggravated sexual battery was a lesser included offense of the charged offense of rape of a child pursuant to Tennessee Code Annotated section 40-18-110(f)(3) (Supp. 2016), which states that aggravated sexual battery is a lesser included offense of rape of a child. Although the Defendant acknowledges that he failed to comply with the statutory requirement that he submit a written request for a lesser included offense jury instruction, *see* T.C.A. § 40-18-110(a)-(c) (2012), he argues that he is entitled to plain error review.[1] The State responds that the issue is waived because the Defendant failed to request the jury instruction in writing and because the Defendant failed to raise the issue in his motion for a new trial. Alternatively, the State argues that a clear and unequivocal rule of the law was not breached.

A criminal defendant has "a right to a correct and complete charge of the law."

---

[1] We note that the version of Code section 40-18-110 effective at the time of the Defendant's March 2016 trial did not state that aggravated sexual battery was a lesser included offense of rape of a child. The 2016 statutory amendment enumerating aggravated sexual battery as a lesser included offense of rape of a child became effective on July 1, 2016. On October 22, 2016, our supreme court released its opinion in *State v. Howard*, 504 S.W.3d 260, 273-75 (Tenn. 2016), concluding that aggravated sexual battery was a lesser included offense of rape of a child for offenses occurring before the July 1, 2016 statutory amendment. *Howard* was released seven months after the Defendant's trial. Because the status of whether aggravated sexual battery was a lesser included offense of rape of a child was not apparent at the time of the trial, the Defendant cannot establish that the omission of the instruction breached a clear and unequivocal rule of law necessary for plain error relief. *See State v. Fayne*, 451 S.W.3d 362, 372 (Tenn. 2014).

*Hanson*, 279 S.W.3d at 280 (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000)). As a result, a trial court has a duty "to give proper jury instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citing *Dorantes*, 331 S.W.3d at 390); *see State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). An erroneous jury instruction, though, may deprive the defendant of the constitutional right to a jury trial. *See Garrison*, 40 S.W.3d at 433-34.

When a party fails to make a written request for a lesser included offense instruction, a trial court may still instruct a jury on the offense. *Bryant v. State*, 460 S.W.3d 513, 523(Tenn. 2015). A party, however, is "not entitled to such an instruction." *Id*. In order for an appellate court to grant plain error relief,

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994); *see State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000). All five factors must be shown. *Smith,* 24 S.W.3d at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id*. In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.*; *Adkisson*, 899 S.W.2d at 642.

The trial transcript does not reflect any discussion between the trial court and the parties regarding the trial court's final instructions to the jury generally, lesser included offenses specifically, or any requests by the parties. Furthermore, the Defendant's brief neither cites to the portion of the record in which jury instructions were discussed nor states whether lesser included offenses were discussed during the trial. The Defendant has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal. *See, e.g.*, *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983); *see* T.R.A.P. 24(b). "When the record is incomplete, or does not contain the proceedings relevant to an issue, this [c]ourt is precluded from considering the issue." *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987). Likewise, "this [c]ourt must conclusively presume that the ruling of the trial court was correct in all particulars." *Id*. (citing *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981); *State v. Baron*, 659 S.W.2d 811, 815 (Tenn. Crim. App. 1983); *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983)); *see State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993). Based upon the record before this court, it is unclear what discussions transpired in the trial court relative to jury instructions generally and lesser included offenses specifically. The only

aspect apparent from the record is that, as the Defendant concedes, he did not submit a written request.

In any event, the Defendant's motion for a new trial did not allege any error with the court's jury instructions. Tennessee Rule of Appellate Procedure 3(e) states, in relevant part,

> in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties, or counsel, or other action committed or occurring during the trial of the case, or other grand upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

As a result, this issue is waived for failure to include the issue in the motion for a new trial. The State chose to indict the Defendant for two offenses connected to each incident, rape of a child and aggravated sexual battery, as alternative theories of the crimes. Although the jury found the Defendant guilty of attempted rape of a child, those convictions merged into the

respective aggravated sexual battery convictions. The Defendant is not entitled to relief on this basis.

## IV.    Sentencing

The Defendant contends that his sentences are excessive. He argues that the trial court abused its discretion by enhancing his sentences from eight to eleven years without finding the enhancement factors to support it. The Defendant does not challenge the court's imposition of partial consecutive service. The State concedes that the court did not explicitly find enhancement and mitigating factors but argues that the court considered the purposes and principles of sentencing and did not abuse its discretion.

The presentence report was received as an exhibit and showed the forty-five-year-old Defendant had previous convictions for misdemeanor theft and felony attempt to sell a schedule II controlled substance. The Defendant reported an eleventh-grade education and stated he suffered from stage five renal failure, underwent daily dialysis, and was removed from the kidney transplant list twice because of his legal problems. The Defendant denied any previous drug use. The report showed that the Defendant became angry during the presentence interview when discussing his previous employment and noted that before he met the victim's mother, he did not have problems. Relative to this case, the Defendant reported that he thought he "was done wrong by [the] court and [his] lawyer . . . and going against [the prosecutor] and the relationship of the [two]. Just because you don't have the money to hire a lawyer you get done this way and it's not fair." The report showed that

-24-

during the interview, the Defendant "continually disparaged the victim, her family, and the court system." The report showed that the Defendant threatened the kill the victim's father if presented with the opportunity.

The victim's father submitted a victim impact statement on behalf of the victim. The victim's father stated that the victim had difficulty sleeping and worried about the Defendant. The victim's father said that the victim stressed about "small things" and had difficulty dealing with normal problems. The victim's father said that the Defendant had changed the victim and her family. The victim began counseling in March 2015, and her counselor told the victim's father that the victim would need continuous counseling for "years to come." The victim's father expressed his anger for the Defendant's conduct and fear for the future. He requested the maximum sentence.

The Defendant testified that that he did not threaten to kill the victim's father during the presentence investigation. He said, "I've never had a cross word with [the victim's father,] and I've never said nothing about [the victim]. I raised [the victim] as long as me and her mother were married the best I could."

Courtney Mabe, the Defendant's older daughter, testified that the Defendant was not violent, did not threaten people, and did not exhibit inappropriate sexual behavior in her presence. She said that the Defendant was a good father and worked hard.

The trial court determined that the Defendant was a Range I, standard offender based upon his previous convictions. The court considered the presentence report, the trial and sentencing hearing testimony, the Defendant's previous convictions, and the arguments of counsel. The court merged Count 1, attempted rape of a child, into Count 2, aggravated sexual battery, and sentenced the Defendant to serve eleven years for each count. The court merged Count 3, attempted rape of a child, into Count 4, aggravated sexual battery, and sentenced the Defendant to eleven years' confinement. The court merged Count 5, attempted rape of a child, into Count 6, aggravated sexual battery, and sentenced the Defendant to serve eleven years.

In determining whether to impose consecutive sentences, the trial court considered the trial evidence, the victim impact statement, the relationship between the victim and the Defendant, and the duration in which the abuse occurred. The court noted that consecutive service was permitted when a defendant was convicted of two statutory offenses involving sexual abuse of a minor. The court ordered Count 2 to be served consecutively to Count 4, for an effective twenty-two-year sentence at 100% service.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of

reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

The record reflects that the trial court imposed within-range sentences for a Range I, standard offender convicted of three Class B felony offenses. *See* T.C.A § 40-35-112(a)(2) ("A Range I sentence . . .[f]or a Class B felony, not less than eight (8) years nor more than twelve (12) years[.]"). The Defendant's eleven-year sentences are within range and are afforded a presumption of reasonableness. The court stated in making its sentencing determinations that it considered the presentence report, the trial and sentencing hearing testimony, the Defendant's previous convictions, arguments of counsel, the victim impact statement, the relationship between the victim and the Defendant, and the duration in which the abuse occurred. Although it is critical for trial courts to place on the record its findings relative to mitigating and enhancement factors pursuant to Tennessee Code Annotated section 40-35-210(e), the record supports the length of the Defendant's sentences. The record does not reflect that any of the mitigating factors applied in this case, and the Defendant does not allege that the trial court should have applied any. *See id*. § 40-35-113. Relative to enhancement factors, the Defendant had previous convictions for theft and attempted sale of a controlled substance, which the trial court considered, although the record does not reflect the court placed significant weight on the Defendant's criminal history. However, the Defendant concedes in his brief that the Defendant abused a position of trust based upon his relationship with the victim. *See id*. § 40-35-114(14) ("The defendant abused a position of . . . private trust . . . in a manner that significantly facilitated the commission or the fulfillment of the offense[.]"). The Defendant was the victim's then-stepfather, and the

offenses occurred when the victim had visitation with her mother, the Defendant's then-wife. "[A] trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). Therefore, we conclude that the Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE